**Claim no. CL-2018-000297**

**CL-2018-000404**

**CL-2018-000590**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**

**COMMERCIAL COURT**

**BETWEEN:-**

**SKAT**

**Claimant**

**and**

**SOLO CAPITAL PARTNERS (IN SPECIAL ADMINISTRATION) & OTHERS**

**Defendants**

---

**SANJAY SHAH DEFENDANTS' RESPONSE TO CLAIMANT'S REQUEST
DATED 4 JUNE 2019 FOR FURTHER INFORMATION UNDER CPR 18**

---

1.  This is the response of the $6_{th}$, $9_{th}$, $30_{th}$, $32_{nd}$, $34_{th}$, $35_{th}$, $44_{th}$, $45_{th}$, $46_{th}$, $47_{th}$, $48_{th}$, $49_{th}$, $50_{th}$, $51_{st}$, $53_{rd}$, $54_{th}$, $55_{th}$, $56_{th}$, and $57_{th}$ Defendants to the First Claim, the $4_{th}$, $18_{th}$, $19_{th}$, and $21_{st}$ Defendants to the Second Claim, and the $8_{th}$ Defendant to the Third Claim (collectively, the "Sanjay Shah Defendants") to the Request for Further Information dated 4 June 2019 pursuant to CPR Part 18 by the Claimant (SKAT) (the "**SKAT Part 18 Request**").

2.  Particular note should be made of the following Sanjay Shah Defendants at this stage:

2.1.   The 35th Defendant to the First Claim (Elysium Global (Dubai) Limited) has not acknowledged service of the claim form for the reasons set out in paragraphs 4 to 14 of the Sanjay Shah Defendants Main Defence.

2.2.   Judgment in default has been entered against the 17th, 24th, 68th Defendants to the First Claim, 22nd Defendant to the Second Claim, and 4th and 5th Defendants to the Third Claim (respectively Elysium Global (UK) Ltd (in liquidation), Solo Capital Limited (in liquidation), Syntax GIS Ltd (in liquidation), Polaris Capital Limited and Polaris Capital (One) Limited). The Sanjay Shah Defendants Main Defence and this response shall be amended to the extent necessary if these Defendants' application to set aside default judgment is not granted.

3.   The Sanjay Shah Defendants respond below to certain of the Claimant's requests for information (or part thereof) without prejudice to whether those requests are properly made under CPR Part 18. As to the remainder of the Claimant's requests, the Sanjay Shah Defendants shall address these so far as appropriate in and/or following disclosure and/or witness evidence.

**Under paragraph 38.1 of the Shah Defendants' Defence**

**Of: "*None of the dividend arbitrage trades (more particularly described at paragraph 56 below) were designed by Mr Sanjay Shah*"**

**REQUEST:**

1.   Please identify the individual(s) who designed the dividend arbitrage trades the subject of these proceedings.

**RESPONSE**

1.   Dividend arbitrage trading has existed for many years and has been carried out by various financial institutions in multiple jurisdictions.  Credit Suisse, ING Bank and Rabobank International previously employed Mr Sanjay Shah where he gained exposure (directly and indirectly) to dividend arbitrage trading involving

non-Danish securities. A number of individuals contributed to the evolution of the dividend arbitrage trades which are the subject of these proceedings, including: Raj Shah, Guenther Grant-Klar, Graham Horn, Jas Bains, Gerry O'Callaghan, Priyan Shah, Craig Price, Darren Lui, Adam Forsyth, Anupe Dhorajiwala and Omar Arti.

**Under paragraph 38.5 of the Shah Defendants' Defence**

**Of: the entire paragraph**

**REQUEST:**

2.    Please clarify what "reasonable steps" Mr Shah took to ensure that SCP's activities were the focus of internal scrutiny.

**RESPONSE:**

2.    This request is not properly required for the Claimant to understand the Sanjay Shah Defendants' defence but is a matter that is more appropriate for witness evidence. Without prejudice to the foregoing Mr Shah, in his capacity as Chief Executive at SCP, employed or arranged to employ experienced legal officers, experienced accountants, experienced compliance personnel and persons with suitable operational experience. Further:

2.1.    Mr Sanjay Shah engaged specialist recruitment agencies who identified and headhunted suitably qualified individuals who were not previously known to Mr Sanjay Shah.

2.2.    At all relevant times, SCP employed HR managers who introduced and oversaw the implementation of employee management systems.

2.3.    The Claimant is referred generally to the personal backgrounds of those individuals who were employed by SCP and are now co-Defendants in this litigation.

**Under paragraph 53 of the Shah Defendants' Defence**

**Of: "***In either circumstance a qualifying shareholder was and is entitled under Danish law to make a WHT Application.***"**

**REQUEST:**

3.    Please confirm whether this is intended to be an averment as to Danish law, or an averment as to Mr Shah's understanding of Danish law.

4.    If the latter, please confirm when this understanding was formed.

**RESPONSE:**

3.    Averments as to Danish law are matters for expert evidence. Paragraph 53 of the Defence is a non-admission of paragraph 21 of the Amended Particulars of Claim.

4.    Not applicable.

**Under paragraph 56.1.5 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUEST:**

5.    Please identify the clients of the Credit Institutions with whom SCP held custody accounts and the periods for which such custody accounts were utilised by SCP in respect of dividend arbitrage trades the subject of these proceedings.

**RESPONSE:**

5.    To the best of the Sanjay Shah Defendants' knowledge and belief (pending disclosure):

    5.1.    JP Morgan (in the period between approximately August 2012 to September/October 2013). And

    5.2.    SEB (in the period between approximately July 2013 to April 2014).

**Under paragraph 56.4 of the Shah Defendants' Defence:**

**Of: "*From approximately June 2012 onwards, SCP, the Sanjay Shah Defendants and/or their directors, in reliance on the matters aforesaid, became a client of JP Morgan through which it cleared futures.*"**

**REQUESTS:**

6.    Please clarify which of the Sanjay Shah Defendants were clients of JP Morgan.

7.    Please clarify when SCP, the Sanjay Shah Defendants and/or their directors ceased to be a client of JP Morgan.

**RESPONSE:**

6.    None.

7.    Approximately September/October 2013.

**Under paragraph 56.4.1 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUESTS:**

8.    Please identify the regulated inter-dealer brokers used.

**RESPONSE:**

8.    To the best of the Sanjay Shah Defendants' recollection and belief (pending disclosure), the inter-dealer brokers which were authorised to operate on the GSS Platform were as follows:

8.1.    Bastion Capital London Ltd.

8.2.    Novus Capital Markets.

8.3.    Mako Financial Markets LLP.

8.4.    Sapien Capital Ltd.

8.5.    FGC Securities LLC.

8.6.    Sunrise Brokers.

8.7.    The TJM Partnership Plc.

8.8.    Arian Financial.

8.9.    London Capital Group Ltd.

**Under paragraph 56.4.5 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUEST:**

9.    Please clarify whether it is the Shah Defendants' case that, on selling the Short Derivative, the purchaser of the Short Derivative also became the legal and beneficial owner of the Equity as a result of the facts and matters alleged in paragraph 56.1.7 and 56.1.8.

**RESPONSE:**

9.    This question is not understood and the Sanjay Shah Defendants are reasonably unable to respond to the same.

**Under paragraph 56.4.6**

**Of: "*In the period before sale (more fully particularised at paragraph 56.4.7 of this Defence) the Equities would be lent out under a stock loan (using a standard Global Master Securities Lending Agreement) to an unrelated party which could be located in any jurisdiction, in order to minimise financing costs.*"**

**REQUESTS:**

10.  Please clarify whether the "*unrelated*" stock borrower is said to have been unrelated to the relevant WHT Applicant, SCP or the Shah Defendants (and if so which). In particular, please clarify whether the stock borrower was owned and controlled by any of the Alleged Fraud Defendants or the persons identified in Schedule 7 to the APOC.

**RESPONSE:**

10.  The phrase "unrelated" means a party that is not connected by common ownership or control. To the best of the Sanjay Shah Defendants' recollection and belief (pending disclosure):

10.1.  None of the stock borrowers were related to (a) the relevant WHT applicant, (b) SCP, or (c) at the relevant time, any of the Sanjay Shah Defendants.

10.2.  The stock borrowers are those identified below. Where the 'owner' or 'controller' of the relevant entity is within the knowledge of the Sanjay Shah Defendants (or can reasonably be ascertained from documents within the possession of the Sanjay Shah Defendants) details of the same are provided:

10.2.1.  AKISHAH Ltd: the director(s) and/or controller(s) are currently unknown.

10.2.2.  Amalthea Enterprises Ltd: the director (at the relevant time) was Guenther Grant-Klar (the $9_{th}$ defendant to the Second English Claim and the $2_{nd}$ defendant to the Fourth English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC).

10.2.3.  Aquila (Cayman) Ltd: the contact person and authorised signatory was Nailesh Teraiya (precise status in the company at the relevant time is currently unknown).

10.2.4.    CEKA Invest GmbH: the director (at the relevant time) was Alexander Korner (a person identified in Schedule 7 to the APOC).

10.2.5.    Colbrook Ltd: the director (at the relevant time) was Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC).

10.2.6.    Cork Oak Capital Ltd: the director(s) and/or controllers(s) are currently unknown.

10.2.7.    Diverse Vision Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.8.    EQ Invest GmbH: the director (at the relevant time) was Alexander Korner (a person identified in Schedule 7 to the APOC).

10.2.9.    Equal Services Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.10.    Esengi Limited: the director (at the relevant time) was Pratul Shah (no relation to Mr Sanjay Shah).

10.2.11.    Fintech Consultancy: the director (at the relevant time) was Bhupendra Mistry (a person identified in Schedule 7 to the APOC).

10.2.12.   Gnosis Capital: the director (at the relevant time) was Bhupendra Mistry (a person identified in Schedule 7 to the APOC).

10.2.13.   LADHI Ltd: the director(s) and/or controllers(s) are currently unknown.

10.2.14.   Neoteric Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.15.   NNPA Ltd: the director(s) and/or controller(s) are currently unknown.

10.2.16.   Philo Capital Ltd: the director (at the relevant time) was Bhupendra Mistry (a person identified in Schedule 7 to the APOC).

10.2.17.   Prince Solutions Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.18.   Principle Markets Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.19.   Relative Value Trading GmbH: the director (at the relevant time) was Alexander Korner (a person identified in Schedule 7 to the APOC).

10.2.20.    Rock Capital Private Fund Ltd: the director (at the relevant time) was Alexander Korner (a person identified in Schedule 7 to the APOC).

10.2.21.    RVT Consult GmbH: the director (at the relevant time) was Alexander Korner/Relative Value Trading GmbH (a person identified in Schedule 7 to the APOC).

10.2.22.    Techevolve: the director(s) and/or controller(s) are currently unknown.

10.2.23.    Tehvah Global Ltd: the director (at the relevant time) was Alexander Koerner/Westlaw Ltd (a person identified in Schedule 7 to the APOC).

10.2.24.    Trance Services Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

10.2.25.    Treehurst Ltd: the directors (at the relevant time) were Martin Smith (the 63rd defendant to the First English Claim; an alleged fraud defendant and person identified in Schedule 7 to the APOC) and Alex Smith.

**Under paragraph 56.4.7 of the Shah Defendants' Defence:**

**Of: "*Subsequently, the USPF would simultaneously: (i) sell the Equities via an inter-dealer broker, (ii) recall the stock loan, and (iii) enter into a long futures position over the Equities in order to close out the short futures position created in paragraph 56.4.5 above.*"**

**REQUEST:**

11.  Please clarify whether, in addition to steps (i) to (iii), the USPF would also simultaneously settle the "buy" transaction referred to in para 56.4.1.

**RESPONSE:**

11.  No.

**Under paragraph 56.4 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUESTS:**

12.  Apart from the Short Derivative and the long derivative (referred to in 56.4.5 and 56.4.7), please clarify whether it is alleged that any of the other transactions forming part of the Futures Trade cleared through SEB, JP Morgan or Citi Bank.

13.  If so, please clarify what part(s) of the Futures Trade cleared through SEB, JP Morgan or Citi Bank.

**RESPONSE:**

12.

    12.1.  For the periods in which SEB and JP Morgan operated as Credit Institutions to SCP, all trades booked through SCP cleared through these Credit Institutions.

    12.2.  As to Citi Bank, this was not a Credit Institution for the reasons set out at paragraph 56.6 of the Defence. In due course (and when appropriate) as a matter of efficient case management the Sanjay Shah Defendants will seek permission to amend paragraph 56.4 of the Defence.

13.  See paragraph 12.1 above.

**Under paragraph 56.8 of the Shah Defendants' Defence:**

Of: "*During 2014 the processing of the Forwards Trade was carried out through SCP by means of three automated systems developed on behalf of SCP and owned by entities in the Elysium Group (collectively "the Platform")*"

**REQUEST:**

14.    Please clarify whether the Platform was used for any of the Futures Trades.

**RESPONSE:**

14.    Yes. TAS was used for some Futures Trades.

**Under paragraph 56.10.2 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUESTS:**

15.    Please identify the suitably qualified external advice and/or input on proposed trading strategies and the persons who provided such advice or input.

**RESPONSE:**

15.    Advice relating to the trading platforms, SCP's systems and corporate structures were provided by Hannes Snellman, Pinsent Masons, Norton Rose, Kinetic Partners (now owned by Duff and Phelps) and CMS Cameron McKenna (now called CMS Law). It is not reasonably necessary for the names of the individuals within those firms to be identified to enable SKAT to prepare its own case or to understand the case it has to meet.

**Under paragraph 56.11 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUEST:**

16.    Please clarify who is alleged to have developed the Futures Trades and the Forwards Trades.

**RESPONSE:**

16.

    16.1.    Futures Trade: principally Rajen Shah and Graham Horn.

    16.2.    Forward Trades: principally Priyan Shah and Gerry O'Callaghan.


**Under paragraph 57.8.1 of the Shah Defendants' Defence:**

**Of: "*The Solo Model was not created contemporaneously. It was prepared in or around 2016 by, a former Assistant Trader employed by SCP. It is a not wholly accurate description of the Future and/or Forward Trade.*"**

**And under paragraph 25.1 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "[…] *the Solo Model at Schedule 6A and paragraph 24(e1) of the Amended Particulars of Claim is not a wholly accurate description of the future and/or forward trades undertaken on the GSS platform.*"**

**REQUESTS:**

17.    Please confirm that, when it is said that the "*Solo Model […] was prepared in around 2016*", this refers to the diagram annexed to the APOC rather than the model of trading depicted in such diagram.

18.    Please identify the "*former Assistant Trader*" who created the Solo Model.

19.    Please clarify at whose direction the "*former Assistant Trader*" created the Solo Model.

20. Please clarify in what material respects, the Solo Model is said to be a "*not wholly accurate*" description of the Future and/or Forward Trade.

**RESPONSE:**

17. Correct.

18. Martin Ward.

19. Sanjay Shah.

20. The Solo Model is a simplistic diagram designed to show trading relationships rather than trade flow or the movement of shares and/or cash. For example:

    20.1.  Each category may represent a large number of different legal entities. For example, multiple BVI/Cayman trading companies may be selling equity stocks to a single USPF/Malaysian trading company. The Platform matched multiple sellers to a single buyer and vice versa.

    20.2.  The role of intermediaries was more complex than the Solo Model suggests. Each intermediary acted as a principal.

    20.3.  The role of brokers was more complex than the Solo Model suggests. Each broker acted as a principal.

    20.4.  The numbers of brokers, intermediaries and counterparts varied and was often higher than the Solo Model suggests.

    20.5.  There are no arrows identifying the dividend compensation payments.

    20.6.  The arrows pointing from SCP are inaccurately pictured as bi-directional whereas in fact all trading instructions were one directional.

**Under paragraph 57.8.3 of the Shah Defendants' Defence:**

**Of: "*Clients of the credit institutions are entitled to and do hold claims against the credit institutions for shares and net dividend payments.*"**

**REQUEST:**

21.    Please confirm whether it is alleged that SCP was a client of the credit institutions
and was entitled to and did hold claims against those credit institutions for shares
and net dividend payments in respect of the WHT Applications.

**RESPONSE:**

21.    During the periods specified above, SCP was a client of JP Morgan, SEB (and
Citi), who are each credit institutions. At the relevant times, it held claims against
JP Morgan and SEB in the sum of zero because the long and short positions in the
account netted off.  This was same for dividend payments.

**Under paragraph 57.8.7 of the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUEST:**

22.    Please confirm whether it is alleged that in the Futures Trades and Forward
Trades, the USPP or MalayCo would always receive dividend compensation
payments, in respect of which the Credit Advice Notes were produced.

**RESPONSE:**

22.    Yes, to the best of the Sanjay Shah Defendants' knowledge and belief (pending
disclosure).

**Under paragraph 57.9 of the Shah Defendants' Defence:**

**Of: "*Paragraph 24(e1)(v) (Schedule 6B) is outside the knowledge of the Sanjay Shah Defendants and accordingly not admitted*"**

**REQUESTS:**

23. Please clarify whether the Shah Defendants' position is that they are unable to identify the parties involved in the Oaks Ledger.

24. If not, please clarify whether and if so to what extent the Shah Defendants dispute the identity of the parties as set out in paragraph 24(e1)(v)(F)-(K) of the APOC.

25. Please clarify whether the Shah Defendants dispute that the Oaks Ledger accurately records the Forwards Trade.

26. If not, please clarify in what ways the Shah Defendants allege it is wrong.

**RESPONSE:**

23. No. The Sanjay Shah Defendants' position is that they do not admit paragraph 24(e1)(5) (Schedule 6B).

24. Not applicable.

25. Not applicable.

26. Not applicable.

**Under paragraph 57.11 of the Shah Defendants' Defence:**

**Of: *"[…] the existence of multiple Credit Advice Notes (for different pension plans on the same day) is irrelevant to Danish fiscal ownership rules."***

**REQUEST:**

27. Please identify the Danish fiscal ownership rules relied on for this proposition.

**RESPONSE:**

27. This is a matter for expert evidence.

**Under paragraphs 80.5 – 80.8 and 80.17 of the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUESTS:**

28.   Please identify in broad terms the services provided by each of First Alton, SSM United, India Atlantic and Icon Beach, in respect of which the invoices were issued and the payments made by Ganymede.

29.   Please clarify whether it is the Shah Defendants' case that they did not know the identity of the principals or representatives of First Alton, SSM, India Atlantic and Icon Beach at the time of making such payments.

30.   If that is not the case, please clarify who the Shah Defendants believed to be the principals or representatives of such entities at the time of such payments.

**RESPONSE:**

28.   Consultancy and referral/introductory services to Ganymede.

29.   As to Requests 29 and 30, "beneficial" ownership of First Alton, SSM, Atlantic India (not India Atlantic) and Icon Beach was not (and is not) within the knowledge of the Sanjay Shah Defendants. To the best of the Sanjay Shah Defendant's knowledge and belief, the principals or representatives of each company (at the relevant time) were as follows:

29.1.   First Alton: Roger Lehman (director).

29.2.   SSM: Kevin Lehman (manager).

29.3.   Atlantic India (not India Atlantic): Doston Bradley (director).

29.4.   Icon Beach: Matthew Tucci (director).

30.   See response 29 above.

**Under paragraphs 80.10 – 80.13 and 80.17 of the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUESTS:**

31.  Please identify in broad terms the services provided by each of First Alton, SSM, Pacific India, India Atlantic, India North, Atlantic India, Starfish Dunes, Sand Dollar, Lava Beach and Icon Beach in respect of which the invoices were issued and payments made by Parla, Acai, Fire and Philo.

32.  Please clarify whether it is the Shah Defendants' case that they did not know the identity of the principals or representatives of Pacific India, India North, Atlantic India, Starfish Dunes, Sand Dollar, Lava Beach and Icon Beach at the time payments were made pursuant to such invoices.

33.  If that is not the case, please clarify who the Shah Defendants believed to be the principals or representatives of such entities at the time of such payments.

**RESPONSE:**

31.  Consultancy and referral/introductory services to Ganymede.

32.  As to Requests 32 and 33, "beneficial" ownership of First Alton, SSM United, Atlantic India (not India Atlantic), India North, Starfish Dunes, Sand Dollar, Lava Beach and Icon Beach was not (and is not) within the knowledge of the Sanjay Shah Defendants. To the best of the Sanjay Shah Defendant's knowledge and belief, the principals and/or representations (at the relevant time) were as follows:

32.1.  Pacific India: Doston Bradley (director).

32.2.  India North: Doston Bradley (director).

32.3.  Atlantic India: Doston Bradley (director).

32.4.  Starfish Dunes: Matthew Tucci (director).

32.5.  Sand Dollar: Matthew Tucci (director).

32.6.  Lava Beach: Matthew Tucci (director).

    32.7.   Icon Beach: Matthew Tucci (director).

33.   See response 32 above.

**Under paragraph 80.17 of the Shah Defendants' Defence:**

**Of: "*To the extent that paragraph 50(c9) is within the knowledge of the Sanjay Shah Defendants it is denied. The payments were wholly legitimate. No efforts were made to conceal the same or their true nature.*"**

**REQUEST:**

34.   Please identify the facts and matters relied upon in support of the assertion that the relevant payments were "*wholly legitimate*".

**RESPONSE:**

34.   Please see responses to requests 28 to 33 above. The payments were made in consideration for the aforesaid parties providing referral and/or consultancy services in connection with a wholly legitimate dividend arbitrage trading strategy.

**Under paragraph 90 of the Shah Defendants' Defence:**

**Of: "*Mr Sanjay Shah admits that some of the Credit Advice Notes were signed by him in wet ink and thereafter a system generated electronic signature was used by SCP. In any event, to the extent that the Custodian Representations were made by SCP, Mr Sanjay Shah did honestly believe that SCP's representations were true, for the reasons set out at paragraphs 38 and 55 to 57 above.*"**

**And under paragraph 94.1 of the Shah Defendants' Defence:**

**Of: "*Mr Sanjay Shah believed that the Credit Advice Notes signed by him in wet ink contained Custodian Representations that were true.*"**

**REQUESTS:**

35.   Please clarify approximately:

    (a) when SCP allegedly started using a system generated electronic signature.

    (b) whether Mr Shah is alleging that his electronic signature was used on Credit Advice Notes without his knowledge and, if so, with respect to which Credit Advice Notes.

**RESPONSE:**

35.   To the best of the Sanjay Shah Defendant's recollection and belief (pending disclosure):

    35.1.   SCP started using electronic signatures between 2013 and 2014.

    35.2.   There were three types of signatures used: (a) wet ink signatures, (b) copy and pasted electronic signatures ("e-signatures"), and (c) computer generated signatures.

    35.3.   Whilst Mr Sanjay Shah was aware that his e-signature and/or computer generated signature was used to sign Credit Advice Notes he was not asked to provide authorisation each and every time it was used and therefore is not able, pending disclosure, to identify each and/or any individual Credit Advice Notes which contained the same.

**Under paragraph 26.4 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*In so far as the facility agreement with T&S Capital is concerned."***

**REQUEST:**

36.   Please identify the facility agreement with T&S Capital referred to, no facility agreement having been pleaded in paragraph 25.6 in the description of the funding of T&S Capital's purchase of shares.

**RESPONSE:**

36.  Please see:

36.1.   Paragraph 25.6.2 of the Defence to Schedule 5B which states:

"25.6.2 Some or all of the monies used to acquire 42,063 of those shares (which were held in a CFD account) were derived from sums advanced under a loan agreement dated 12 January 2016 between Ms Budia (as borrower) and Elysium Dubai (as lender) in the sum of up to £500,000."

36.2.   The Sanjay Shah Defendant's response to SKAT's request dated 28 May 2019 for disclosure pursuant to Practice Direction 51U provided a copy of the loan agreement.

36.3.   (Please note that there is a typographical error in the spelling of "Budia" which should read "Bhudia".)

**Under paragraph 38.5 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*The Sanjay Shah Defendants intended to promote the concept of replicating the GSS business within the structure of [Varengold] bank (independent of SCP and its related entities).*"**

**REQUEST:**

37.  Please confirm whether it was intended that Varengold's replication of the GSS business would also include dividend arbitrage in respect of Danish shares.

**RESPONSE:**

37.  The Sanjay Shah Defendants intended to promote the concept of the GSS business generally to Varengold bank, but Mr Sanjay Shah did not take any decisions whether or not to promote dividend arbitrage in respect of Danish shares to Varengold, far less commence the New Product Approval Process (Varengold's internal systems to assess potential new products) in respect of the trading that is now the subject of this claim.

**Under paragraphs 43 and 44 of Schedule 5B to the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUEST:**

38.  No response is pleaded to Amended Sch 5B, para 12A of the APOC. Please clarify the Shah Defendants' position.

**RESPONSE:**

38.  Paragraph 12A, Schedule 5B of the APOC does not exist.


**Under paragraph 63.3 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*The individuals Mr Sanjay Shah liaised with for the purposes of providing introductory services as set out in the subparagraph above included […] former co-workers at Credit Swiss [sic]*"**

**And under paragraph 63.5 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*Mr Sanjay Shah thereafter met with the individual representatives of the prospective pension funds*"**

**REQUESTS:**

39.  Please identify the former co-workers at Credit Suisse who provided the introductory services to identify potential individual representatives of prospective pension funds.

40.  Please identify the personal representatives of prospective pension funds who were introduced to Mr Shah by each of (1) Mr Murphy; (2) Mr Godson and (3) the former co-workers at Credit Suisse.

**RESPONSE:**

39.   The former co-worker at Credit Suisse was Robert Klugman.

40.   As to Request 40:

40.1.   Mr Murphy introduced Mr Sanjay Shah to Daniel Fletcher, who in turn introduced him to Matthew Tucci and Doston Bradley.

40.2.   Mr Godson gave names to SCP directly. The identities of the same are not within Mr Sanjay Shah's knowledge.

40.3.   Mr Klugman introduced Richard Markowitz and Matthew Stein.


**Under paragraph 79.4 [sic: 80.4] of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*Payment was made from AESA's custody account held with SCP from monies loaned by Mr Sanjay Shah (having received a bonus payment from Ganymede).*"**

**REQUESTS:**

41.   Please clarify whether it was alleged that a loan agreement was entered into between AESA and Mr Shah and, if so, whether that was in writing or oral and when it was agreed.

42.   Please identify the date and size of the bonus referred to.

**RESPONSE:**

41.   To the best of the Sanjay Shah Defendants' knowledge and belief, the loan advanced by Mr Sanjay Shah to AESA was pursuant to an oral agreement which was made on or around 30 June 2014.

42.   On or about 30 June 2014 Ganymede authorised a bonus payment to Mr Sanjay Shah in the sum of £1,639,479.


**Under paragraph 106.2 of Schedule 5B to the Shah Defendants' Defence:**

Of: "*The funds were transferred from the custody account held by Ganymede with SCP pursuant to an inter-company loan between Ganymede and Elysium Dubai.*"

**REQUEST:**

43.  Please identify the terms of the loan entered into between Ganymede and Elysium Dubai, whether it was agreed in writing or orally, and when.

**RESPONSE:**

43.  To the best of the Sanjay Shah Defendants' knowledge and belief, the inter-company loan advanced by Ganymede to Elysium Dubai was pursuant to an oral agreement which was made on or before 19 August 2014 and repayable on demand.

**Under paragraph 106.6 of Schedule 5B to the Shah Defendants' Defence:**

**Of: the entire paragraph**

**REQUEST:**

44.  Please identify the nature of the services provided by Mr Dhorajiwala which allegedly entitled him to performance bonuses totalling €8m.

**RESPONSE:**

44.

44.1.  Mr Dhorajiwala was employed by Elysium Dubai from 15 January 2012 to 30 September 2013.

44.2.  From incorporation to 9 April 2014 Elysium Dubai was called Solo Capital (Dubai) Limited. On incorporation Elysium Dubai became part of the Solo Group and remained so until 20 March 2014.

44.3.  The bonus payments totalling €8 million (€4 million on 5 February 2015, €2 million on 11 May 2015 and €2 million on 3 June 2015) were paid by

Elysium Dubai to Mr Dhorajiwala in recognition of the services provided during his tenure with Elysium Dubai.

44.4.    Solo Group employees' remuneration had two components: basic salary and discretionary performance related bonuses. Discretionary performance related bonuses reflected the profit achieved by a particular business unit and the contribution that the individual provided to that profit. Mr Dhorajiwala was head of finance for GSS and a senior member of management. His discretionary bonus therefore reflected the profit made by the GSS business unit and his overall contribution to the same.

**Under paragraph 106.9 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*Sub-paragraph (c)(iiA) is admitted.*"**

**REQUEST:**

45.    Please confirm whether the admission relates to each of the details of the payments and the inferences drawn by SKAT in para 94(c)(iiA) of the Particulars of Claim, including that Mr Dhorajiwala received US$2,249,748.12 as a bonus.

**RESPONSE:**

45.    This response is provided on the basis that this request relates to paragraph 93(c)(iiA) of Schedule 5B to the Particulars of Claim.

45.1.    As to sub-paragraph (A), paragraph 44 of the Defence to Schedule 5B is repeated.

45.2.    As to sub-paragraph (B) to (G), the accuracy of the transactions is admitted. It is denied that the sums are the traceable proceeds of SKAT's money, as alleged or at all.

**Under paragraphs 109.1 and 109.2 of Schedule 5B to the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUEST:**

46.    In respect of those payments which the Shah Defendants aver were "*distributions*" from Ganymede between 25 October 2014 and 20 October 2015, please confirm who authorised the payment of the said dividends.

**RESPONSE:**

46.    Mr Sanjay Shah.

**Under paragraphs 126.1 to 126.3 of Schedule 5B to the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUEST:**

47.    Please clarify on what basis it is alleged that the description should read "*Transfer from Ganymede*" when the payments alleged were received by Ganymede.

**RESPONSE:**

47.    These were transferred from the custody account held by Ganymede with SCP to accounts held by Ganymede with Varengold bank.

**Under paragraph 152.7 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*Treefrog provided a loan to Varengold Bank to assist with business development opportunities in Hong Hong [sic].*"**

**REQUEST:**

48.    Please identify the date and size of the loan provided by Treefrog to Varengold Bank.

**RESPONSE:**

48.   This is an error and obviously so: Treefrog did not loan monies to Varengold Bank. On or about 28 November 2014 Varengold and Treefrog entered into a cooperation agreement. Pursuant to the terms of that agreement, it was intended that the sums advanced by Treefrog would assist with business development opportunities in Hong Kong.  In due course (and when appropriate) as a matter of efficient case management the Sanjay Shah Defendants will seek permission to amend their Defence accordingly.

**Under paragraph 205.4 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*On 5 June 2015 the sum of £12,715,427.23 was transferred to the sellers.*"**

**REQUEST:**

49.   Please identify the party who paid the said sum to the sellers in respect of the shares in Honey Jersey, identifying the account from which payment was made.

**RESPONSE:**

49.   The payment of £12,715,427.23 was made from the sterling custody account held by Ganymede with SCP. The accounting entry for this payment is a dividend issued by Ganymede to its parent company, Elysium Global, who in turn provided a loan to Elysium Property Holdings Limited, who in turn provided a loan to Trixor Holdings Limited for purchase of the shares in Honey Jersey Limited.

**Under paragraph 217.2 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*As to FGC Securities LLC, any trading conducted by them on the GSS platform was prior to the aborted acquisition of its shareholdings by FGC Elysium Holdings.*"**

**REQUEST:**

50.    Please describe in broad terms the nature of the trading undertaken by FGC
       Securities LLC on the GSS platform. In particular, please clarify whether it was a
       party to any of the Forwards Trades or Futures Trades.

**RESPONSE:**

50.    To the best of the Sanjay Shah Defendants' recollection and belief, FGC
       Securities LLC was an equity broker in the Forward Trades.

**Under paragraph 217.3.2 of Schedule 5B to the Shah Defendants' Defence:**

**Of: "*On or about 14 August 2015 the sum of $10,999,960 was transferred from an
account held by FGC Elysium Holdings to an account held by FGC Elysium Inc with
First Republic Bank (a/c 80003218773).*"**

**REQUEST:**

51.    Please explain what happened to this sum paid to FGC Elysium Inc following the
       aborted transaction.

**RESPONSE:**

51.    On 11 January 2016 the name of FGC Elysium Inc was changed to DBX Elysium
       Inc (see paragraph 217.3.4 of the Defence to Schedule 5B). As of 1 April 2016 the
       balance of DBX Elysium Inc's account with First Republic Bank (USD a/c 8000
       321 8773) was $10,999,960. The following sums were then transferred to Elysium
       Dubai's account with ADIB (USD a/c 16755792):

| Date       | Amount received (less $30 transfer fee) |
|------------|------------------------------------------|
| 05.04.2016 | $249,970                                 |
| 12.04.2016 | $449,970                                 |
| 13.04.2016 | $449,970                                 |

| | |
|---|---|
| 19.04.2016 | $449,970 |
| 20.04.2016 | $449,970 |
| 21.04.2016 | $399,970 |
| 23.04.2016 | $749,979 |
| 23.04.2016 | $459,970 |
| 26.04.2016 | $949,970 |
| 26.04.2016 | $474,970 |
| 28.04.2016 | $474,970 |
| 30.04.2016 | $1,949,970 |
| 02.05.2016 | $2,949,970 |
| 04.06.2016 | $99,970 |
| 14.06.2016 | $279,970 |
| 10.08.2016 | $29,970 |
| **Total** | **$10,869,529** |

Additionally:

51.1.   Sums totalling $40,950 were transferred to 803B LLC for various administration fees and expenses incurred in the execution of business on behalf of DXB Elysium, including monthly directorship fees ($20,950 on 7 April 2016, $10,000 on 2 May 2016 and $10,000 on 2 June 2016).

51.2.   Sums totalling $70,000 were transferred to PLE Consulting LLC for various administration fees and expenses incurred in the execution of business on behalf of DXB Elysium, including monthly directorship fees ($10,000 on 5 July 2016, $10,000 on 9 August 2016, $10,000 on 9 September 2016, $10,000 on 5 October 2016, $10,000 on 14 November 2016, $10,000 on 12 December 2016 and $10,000 on 11 January 2017).

51.3.   The sum of $5,800 was transferred to the law office of Melanie Ryan LLC.

51.4.   Sums totalling $366.75 were deducted by the bank in satisfaction of account service charges.


**Under paragraphs 3.3 and 3.5 of Schedule 5L to the Shah Defendants' Defence:**

**Of: the entire paragraphs**

**REQUEST:**

52.   Please clarify who owns the remaining 49,799 ordinary shares in Colbrook.

**RESPONSE:**

52.   In order to respond to the Amended Particulars of Claim, the Sanjay Shah Defendants' interrogated the available company documents for Colbrook (a company which until on or about 9 November 2016 was under the ownership and control of Martin Smith). As stated at paragraph 3.3 of the Defence to Schedule 5L and the Sanjay Shah Defendants' response to SKAT's request dated 29 May 2019 for disclosure pursuant to Practice Direction 51U, the following details were recorded on the registrar of directors, officers and members (see certified copy dated 13 June 2014 disclosed to SKAT on 28 June 2019):

> "Note: On 13 June 2014 sole shareholders resolutions were passed approving the reclassification of share capital from US$50,000 shares @ US$1.00 par to 49,800 ordinary shares of a par value of US$1.00 each and 200 preferred shares of a par value of US$1.00 each.

Pursuant to the Practice Direction 51U disclosure request, the Sanjay Shah Defendants' made further enquiries and confirmed that the number of authorised shares is 49,800 however only one share ($1 par value) has in fact been issued. Martin Smith was the owner of the single issued share in Colbrook which, on or about 9 November 2016, was transferred to Elysium Dubai pursuant to a Share Purchase Agreement. The Sanjay Shah Defendants confirm that the remaining authorised shares have not been issued.

**NIGEL JONES QC**
*Hardwicke Chambers*

**LISA FREEMAN**
*Furnival Chambers*

**LAURENCE PAGE**
*Hardwicke Chambers*

16 September 2019

**STATEMENT OF TRUTH SANJAY SHAH DEFENDANTS' RESPONSE TO CLAIMANT'S REQUEST DATED 4 JUNE 2019 FOR FURTHER INFORMATION UNDER CPR 18**

*I believe that the facts stated in this Response to the Claimant's Request dated 4 June 2019 for Further Information under CPR 18 are true.*

*Signed:*

*Name:*    **Sanjay Mansukhlal Shah**

---

**STATEMENT OF TRUTH SANJAY SHAH DEFENDANTS' RESPONSE TO CLAIMANT'S REQUEST DATED 4 JUNE 2019 FOR FURTHER INFORMATION UNDER CPR 18**

*The 6th, 9th, 30th, 32nd, 35th and 53rd Defendants to the First Claim, the 4th, 18th, and 21st Defendants to the Second Claim, and the 8th Defendant to the Third Claim believe that the facts stated in this Response to the Claimant's Request dated 4 June 2019 for Further Information under CPR 18 are true.*

*I am duly authorised to sign this statement of truth.*

*Signed:*

*Name:*    **Sanjay Mansukhlal Shah**
Position:    Director, t*he 6th, 9th, 30th, 32nd, 35th and 53rd Defendants to the First Claim, the 4th, 18th and 21st Defendants to the Second Claim, and the 8th Defendant to the Third Claim*

---

**STATEMENT OF TRUTH SANJAY SHAH DEFENDANTS' RESPONSE TO CLAIMANT'S REQUEST DATED 4 JUNE 2019 FOR FURTHER INFORMATION UNDER CPR 18**

*The 44th, 45th, 46th, 47th, 48th, 49th, 50th, 51st, 54th, 55th, 56th, and 57th Defendants to the First Claim, and the 4th Defendant to the Second Claim believe that the facts stated in this Response to the Claimant's Request dated 4 June 2019 for Further Information under CPR 18 are true.*

*I am duly authorised to sign this statement of truth.*

*Signed:*

*Name:*    **Sanjay Mansukhlal Shah**
Position:    Director, IP Universal

**STATEMENT OF TRUTH SANJAY SHAH DEFENDANTS' RESPONSE TO CLAIMANT'S REQUEST DATED 4 JUNE 2019 FOR FURTHER INFORMATION UNDER CPR 18**

*The 19th Defendant to the Second Claim believes that the facts stated in this Response to the Claimant's Request dated 4 June 2019 for Further Information under CPR 18are true.*

*I am duly authorised to sign this statement of truth.*

*Signed:*

*Name:*        **Sanjay Mansukhlal Shah**
Position:      Grantee of Power of Attorney dated 10 April 2018